IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

GABRIEL G. ATAMIAN, MD, MSEE, JD, )
                                  )
                    Plaintiff,    )
                                  )
          v.                      )   C. A. No. 06-183-SLR
                                  )
JAMES J. GENTILE, DDS, SECRETARY  )
JANE DOE, a/k/a SHELBY,           )
                                  )
                    Defendants.   )


**MEMORANDUM IN SUPPORT OF DEFENDANTS, JAMES J.
GENTILE, DDS AND JANE DOE, A/K/A/ SHELLY
SIMEONE'S IN SUPPORT OF THEIR MOTION TO DISMISS**

MORRIS, JAMES, HITCHENS & WILLIAMS LLP
Amy A. Quinlan (#3021)
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE  19899
(302) 888-6800
Attorneys for Defendants
aquinlan@morrisjames.com

August 11, 2006

## NATURE AND STAGE OF PROCEEDINGS

On March 17, 2006, Gabriel G. Atamian ("Atamian") filed this action alleging diversity jurisdiction pursuant to 28 U.S.C. § 1332. (D.I. 2).  He appears pro se and on April 13, 2006 was granted in forma pauperis status pursuant to 28 U.S.C. § 1915. (D.I. 8).  On June 2, 2006, this Court dismissed several of the counts set forth in the Complaint, but allowed Atamian to proceed with counts I, II, III, IV, VI, VII and VIII,  which state claims based upon Pennsylvania law for, among other things, medical malpractice and failure to provide medical records.

Because James J. Gentile and Shelly Simeone lack the requisite contacts with Delaware, Defendants seek to dismiss this action for lack of personal jurisdiction and improper venue, and hereby submit this Memorandum in Support of their Motion to Dismiss.

## STATEMENT OF FACTS

### A.    The Parties

Atamian is an individual and is a resident of the State of Delaware.  (D.I. 2 at ¶ 2.)

Defendant, Dr. Gentile, is a Pennsylvania resident and is licensed to practice dentistry in the State of Pennsylvania.  (Gentile Affidavit at ¶ 3, 4.)  Dr. Gentile does not have a license to practice dentistry in the State of Delaware, nor has he ever maintained any offices here.  (Gentile Aff. ¶ 5, 6.)[1]

Ms. Simeone is also a Pennsylvania resident and is employed by Dr. Gentile in his dental offices in Pennsylvania. (Simeone Affidavit ¶ 3, 4.)

### B.    Plaintiff's Allegations

Through his Complaint, Atamian alleges various claims arising from dental care and treatment provided by Dr. Gentile to Atamian on or about August 17, 2004. (D.I. 2.)  As a result of that treatment, Plaintiff seeks damages in the amount of $250,000.00.

---

[1] Defendants are submitting the affidavits of James J. Gentile (the "Gentile Affidavit") and Shelly Simeone (the "Simeone Affidavit") in support of these jurisdictional arguments.

## QUESTIONS PRESENTED

1.      Does Delaware's long-arm statute, 10 *Del. C.* § 3104, confer personal jurisdiction upon the Defendants?

2.      Is subjecting Defendants to the jurisdiction of this Court consistent with the Due Process Clause of the Fourteenth Amendment?

3.      Should this action be dismissed for improper venue?

# ARGUMENT

## A.    Applicable Standard.

For the purposes of deciding this motion, the court must resolve all disputed facts and view all factual inferences in the light most favorable to the plaintiff. *Wright, v. American Home Products,* 768 A.2d 518, 526 (Del.Super.2000).   However, when a non-resident defendant's motion to dismiss challenges personal jurisdiction, the plaintiff has the burden to show the basis for the court's jurisdiction over that defendant. *Id.* at 526. To satisfy this burden, Atamian must make a prima facie showing that this court may exercise personal jurisdiction over both Defendants. *Id.*  Once the defense has been raised, then the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence. *Time Share Vacation Club v. Atlantic Resorts, Ltd.,* 735 F.2d 61, n. 9 (3rd Cir. 1984).  At no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction. *Id.*  "Unlike a Fed. R. Civ. P. 12(b)(6) motion to dismiss, when considering a Rule 12(b)(2) motion to dismiss, the court does not limit its analysis to allegations contained in the pleadings but, rather, makes its determination of whether personal jurisdiction lies by reference to materials outside of the pleadings." *Greene v. New Dana Perfumes Corp.,* 287 B.R. 328, 333 (D. Del. 2002).

Here, plaintiff cannot satisfy its burden of establishing sufficient minimum contacts between Dr. Gentile or Ms. Simeone to support either jurisdiction or proper venue.  The Court therefore should dismiss Atamian's Complaint in its entirety.

The determination of whether the defendants are subject to personal jurisdiction requires a two-part analysis. First, the court must examine whether the language of the Delaware long-arm statute, 10 *Del. C.* § 3104(c), reaches the defendant. Second, if the court finds that the Defendants' conduct gives rise to personal jurisdiction under the long-arm statute, the court must then determine whether subjecting the defendants to jurisdiction in Delaware would comport with the Due Process Clause of the Fourteenth Amendment. *See Intel Corp. v. Silicon Storage Technology, Inc.*20 F.Supp.2d 690, 694 (D.Del.1998)

Here, plaintiff cannot meet his burden because the defendants do not reside in Delaware, have not transacted business as required under Delaware's long-arm statute, 10 *Del. C.* §3104(c), nor do they have the requisite "minimum contacts" with Delaware necessary to satisfy the requirements of due process.

**B.      Delaware's Long-Arm Statute, 10 *Del. C.* § 3104(c), Does Not Provide a Basis for Asserting Personal Jurisdiction Over the Defendants.**

Under Section 3104(c), the plaintiff has the burden of demonstrating that the defendants: (1) transacted any business or performed any character of work or service in Delaware; (2) contracted to supply services or things in Delaware; (3) caused tortious injury in Delaware by an act or omission in Delaware; (4) caused tortious injury and regularly does business in Delaware; (5) has an interest in real property in Delaware; or (6) contracts to insure a person or property in Delaware. Plaintiff fails to mention, much less address, any of these requirements – and for good reason, because none of the requirements have been met.

There are simply no allegations in the Complaint to support either specific or general jurisdiction. "Specific jurisdiction arises when the particular cause of action arose from the defendant's activities within the forum state; general jurisdiction arises when the defendant has continuous systematic contacts with the state, irrespective of whether the defendant's

connections are related to the particular cause of action." *Id.* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 (1984)).  Plaintiff cannot meet either burden here.  Specifically, to establish specific jurisdiction under either Section 3104(c)(1) or (c)(3), plaintiff must demonstrate that any alleged wrongful acts occurred *in Delaware,* and the injury must be *in Delaware.*  Furthermore, to meet his burden, plaintiff must show that the causes of action actually arise from or have a nexus with the alleged conduct in Delaware. *See, e.g., Cornerstone Technologies, LLC v. Conrad*, 2003 WL 1787959, at *9 (Del. Ch. March 31, 2003).  In other words, for jurisdictional purposes, it will be insufficient for plaintiff to allege that the defendants have connections to Delaware that are unrelated to plaintiff's causes of action.

In the instant case, Dr. Gentile is a Pennsylvania resident (Gentile Affidavit ¶ 3) and is licensed to practice dentistry in the State of Pennsylvania. (Gentile Affidavit ¶ 4).  Similarly, Ms. Simeone also resides and works in Pennsylvania (Simeone Affidavit ¶ 3, 4).  Moreover, the Complaint alleges, and the Court has acknowledged, that none of the purported wrongful acts took place in Delaware. (D.I. 2; D.I. 9 at 1.)

Subsection (c)(4), which provides for general jurisdiction, requires "a higher level of regular contacts in the State than [for] . . . 'specific jurisdiction.'" *Saft Am., Inc. v. Ovonic Battery Co.,* 1996 WL 190008, at *3 (D. Del., Mar. 25, 1996).  As this Court acknowledged, "the standard for general jurisdiction is high in practice and not often met." *TriStrata Technology, Inc. v. Neoteric Cosmetics, Inc.,* 961 F.Supp. 686, 691 (D.Del.,1997).  Under Subsection (c)(4), the defendant must be "generally present" in Delaware. *Id.*  To be "generally present," Delaware law requires that "the defendant or agent 'regularly . . . solicits business, engages in any other persistent course of conduct in the State, or derives substantial revenue from services, or things consumed in the State.'" *Id.*  As made clear in his affidavit, Dr. Gentile

does not practice dentistry in Delaware, nor does he even have a license here. He does not advertise his services in Delaware and maintains no offices in this state. (Gentile Affidavit ¶ 6, 7.) There simply are no allegations in the Complaint suggesting that either defendant had any contact whatsoever with the State of Delaware, much less a "general" and systematic one. And, any alleged wrongdoing occurred in Pennsylvania – not Delaware. Section 3104 simply does not allow a nonresident to be pulled into a Delaware court when it has no contacts with the forum.

C.    **The Exercise of Personal Jurisdiction Over the Defendants Violates the Due Process Clause of the Fourteenth Amendment.**

For many of the same reasons that the defendants have insufficient contacts in Delaware to satisfy § 3104(c), they also lack the requisite contacts with Delaware to allow the exercise of personal jurisdiction consistent with due process. "Due process requires that a defendant have certain minimum contacts with the forum state in order to ensure that the maintenance of the lawsuit does not offend 'traditional notions of fair play and substantial justice.'" *Merck & Co., Inc. v. Barr Laboratories, Inc.,*179 F.Supp.2d 368, 375 (D.Del.,2002) The Supreme Court has made clear that to maintain general jurisdiction over a foreign defendant, the facts must establish "continuous and systematic general business contacts" within the forum state. *Helicopteros,* 466 U.S. at 416. "Furthermore, the . . . Third Circuit has held that a plaintiff must show significantly more than mere minimum contacts to establish general jurisdiction." *Merck,* 179 F. Supp. 2d at 375 (citation omitted). Moreover, the state must also have some "palpable interest rationally connected with public policy in adjudicating a dispute within its borders for jurisdiction to be lawfully acquired." *Magid v. Marcal Paper Mills, Inc.*, 517 F. Supp. 1125, 1131 (D. Del. 1981) (citations omitted).

Here, the defendants have had no specific or general contacts with Delaware, and certainly no "continuous and systematic general business contacts." Moreover, Delaware has no

interest in adjudicating a malpractice action relating to care given by a physician licensed to

practice in Pennsylvania to a patient in his offices, also in Pennsylvania.

**D.     This Action Should be Dismissed For Improper Venue as Set Forth in 28 U.S.C. §1406(a).**

As stated in the Complaint, this is a diversity action.  (D.I. 1 ¶ 1.)  The federal statute

governing venue for diversity actions is 28 U.S.C. §1391(a), which states in pertinent part as

follows:

> that "[a] civil action wherein jurisdiction is founded only on diversity of
> citizenship may, except as otherwise provided by law, be brought only in (1) a
> judicial district where any defendant resides, if all defendants reside in the same
> State, (2) a judicial district in which a substantial part of the events or omissions
> giving rise to the claim occurred, . . . or (3) a judicial district in which any
> defendant is subject to personal jurisdiction at the time the action is commenced,
> if there is no district in which the action may otherwise be brought.

As stated above, neither Dr. Gentile nor Ms. Simeone reside in Delaware.  Rather, both

defendants are Pennsylvania residents.   (Gentile Affidavit ¶ 3; Simeone Affidavit ¶ 3.)

Moreover, any of the alleged wrongful acts took place in Pennsylvania.  Finally, neither

defendant is subject to personal jurisdiction here.  Thus, venue is not proper.

Section 1406(a) provides for the dismissal of a case which has been filed in the wrong

division or district, or if it is in the interest of justice, transfer of the case to any district or

division in which it could have been brought.  Defendants submit that the interest of justice

require this matter to be dismissed rather than simply transferred.

Plaintiff has failed to file the required Certificate of Merit within the time set forth by

Pa.R.C.P. No. 1042.3., which provides as follows:

> In any action based upon an allegation that a licensed professional deviated from
> an acceptable professional standard, the attorney for the plaintiff, or the plaintiff if
> not represented, shall file with the complaint or within sixty days after the filing
> of the complaint, a certificate of merit signed by the attorney or party . . . .

The Complaint was filed on March 17, 2006. (D.I. 2.)  To date, plaintiff has filed neither the required certificate nor a motion to extend the time to file the certificate.  In such cases, the Prothonotary is required to enter a judgment of *non pros* against the plaintiff for failure to file a Certificate of Merit within the required time.  *See* Pa.R.C.P. No. 1042.6(a).[2]  Therefore, this action should be dismissed.

---

[2] This Court's June 2, 2006 Order (D.I. 9) indicated that Pennsylvania law would apply here.  However, to the extent that the Delaware procedural law would apply to the claims set forth in the Complaint, 18 *Del. C.* § 6853 requires that an appropriate Affidavit of Merit be filed contemporaneously with the Complaint, otherwise, the matter must be dismissed.  Thus, both Delaware and Pennsylvania law dictate that this action must be dismissed.

## CONCLUSION

For the foregoing reasons, defendants James J. Gentile, DDS, and Shelly Simeone, respectfully request that the Court dismiss plaintiff's action.

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

_____

Amy A. Quinlan (#3021)
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE  19899
(302) 888-6800
Attorneys for Defendants
aquinlan@morrisjames.com

Dated: August 11, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2006, I electronically filed MEMORANDUM

IN SUPPORT OF DEFENDANTS, JAMES J. GENTILE, DDS AND JANE DOE,

A/K/A/ SHELLY SIMEONE'S IN SUPPORT OF THEIR MOTION TO DISMISS

and this Certificate of Electronic Service with the Clerk of Court using CM/ECF.

I hereby certify that on August 11, 2006, I have mailed by United States Postal

Service, the document(s) to the following non-registered participants:

Gabriel Atamian (*pro se*)
1021 N. State Street, Apt. A
Dover, DE  19901

Amy A. Quinlan (#3021)
Morris, James, Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE  19899
(302) 888-6800
aquinlan@morrisjames.com

1445822/1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

GABRIEL G. ATAMIAN, MD, MSEE, JD, )
)
Plaintiff, )
)
v. )  C. A. No. 06-183-SLR
)
JAMES J. GENTILE, DDS, SECRETARY )
JANE DOE, a/k/a SHELBY, )
)
Defendants. )

**EXHIBITS 1 – 4 TO MEMORANDUM IN SUPPORT OF
DEFENDANTS, JAMES J.  GENTILE, DDS AND JANE DOE, A/K/A/
SHELLY SIMEONE'S IN SUPPORT OF THEIR MOTION TO DISMISS**

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

GABRIEL G. ATAMIAN, MD, MSEE, JD, )
                                    )
                Plaintiff,          )
                                    )
        v.                          ) C. A. No. 06-183-SLR
                                    )
JAMES J. GENTILE, DDS, SECRETARY    )
JANE DOE, a/k/a SHELBY,             )
                                    )
                Defendants.         )

**AFFIDAVIT OF JAMES J. GENTILE, DDS**

STATE OF PENNSYLVANIA      )
                           )  SS:
COUNTY OF _Delaware_       )

James J. Gentile, DDS, being duly sworn according to law, deposes and says as follows:

1.    I make this Affidavit upon personal knowledge.

2.    I am a defendant in the above-captioned lawsuit.

3.    I am a resident of the State of Pennsylvania.

4.    I am licensed to practice dentistry in the State of Pennsylvania.

5.    I do not possess now, nor have I ever possessed, a license to practice dentistry in

the State of Delaware.

6.    At all relevant times, I have maintained offices located in Media, Pennsylvania,

and not in Delaware.

7.    I have never actively advertised my services in Delaware.

8.    All treatment and care of Mr. Atamian took place in my offices in Pennsylvania.

_____

JAMES J. GENTILE, DDS

SWORN TO AND SUBSCRIBED before me, a Notary Public, this 11th day of

August        , 2006.


_____

Notary Public


COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Nancy R. Mackrides, Notary Public
Media Boro, Delaware County
My Commission Expires June 19, 2010
Member, Pennsylvania Association of Notaries

2

**EXHIBIT  2**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

GABRIEL G. ATAMIAN, MD, MSEE, JD, )
                                  )
           Plaintiff,     )
                                  )
       v.                 ) C. A. No. 06-183-SLR
                                  )
JAMES J. GENTILE, DDS, SECRETARY )
JANE DOE, a/k/a SHELBY,         )
                                  )
         Defendants.    )

**AFFIDAVIT OF SHELLY SIMEONE**

STATE OF PENNSYLVANIA      )
                             ) SS:
COUNTY OF _Delaware_      )

Shelly Simeone, being duly sworn according to law, deposes and says as follows:

1.      I make this Affidavit upon personal knowledge.

2.      I am a defendant in the above-captioned lawsuit.

3.      I am a resident of the State of Pennsylvania.

4.      At all times relevant, I have been employed by Dr. Gentile in his offices located

in Media, Pennsylvania, and not in Delaware.

_Shelly Simeone_
SHELLY SIMEONE

SWORN TO AND SUBSCRIBED before me, a Notary Public, this __11th__ day of

__August__, 2006.

_Nancy R. Mackrides_
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Nancy R. Mackrides, Notary Public
Media Boro, Delaware County
My Commission Expires June 19, 2010
Member, Pennsylvania Association of Notaries

# EXHIBIT  3

Westlaw.

Not Reported in F.Supp.                                                                    Page 1
Not Reported in F.Supp., 1996 WL 190008 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

C
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
SAFT AMERICA, INC., Plaintiff,
v.
OVONIC BATTERY COMPANY, INC., and Energy
Conversion Devices, Inc., Defendants and
Counterplaintiffs,
v.
SAFT AMERICA, INC., Saft, S.A., GS-Saft, Societe
De Services De Propriete Industrielle, and Japan
Storage Battery Company, Inc. Counterdefendants.
**No. CIV. A. 95-430-SLR.**

March 25, 1996.

Bruce M. Stargatt, Josy W. Ingersoll, and John W.
Shaw, of Young, Conaway, Stargatt & Taylor,
Wilmington, Delaware, for Counterplaintiffs. Of
Counsel: Chester T. Kamin, Esquire, David J.
Bradford, Terri L. Mascherin, and Paul T.
Whitcombe, of Jenner & Block, Chicago, Illinois;
Lawrence G. Norris, of Rothwell, Figg, Ernst &
Kurz, Washington, D.C.; and Marvin S. Siskind, Vice
President/Patent Counsel, Energy Conversion
Devices, Inc., Troy, Michigan.
Thomas R. Hunt, Jr., Jack B. Blumenfeld, and Karen
Jacobs Louden, of Morris, Nichols, Arsht & Tunnell,
Attorneys for Counterdefendants Societe de Services
de Propriete Industrielle, Saft America, Inc., and Saft,
S.A. Of Counsel: Neil B. Siegel, Esquire, David J.
Cushing, Esquire, and Mark Boland, of Sughrue,
Mion, Zinn, MacPeak & Seas, Washington, D.C.

MEMORANDUM OPINION
ROBINSON, District Judge.

I. INTRODUCTION

*1 SAFT America, Inc. filed this action against
Ovonic Battery Company, Inc. ("Ovonic") and
Energy Conversion Devices, Inc. ("ECD") on
September 8, 1995. SAFT America seeks a
declaration that defendants' patent on a certain nickel
metal hydride battery technology is invalid and that
SAFT America has not infringed. In their answer and
counterclaim, defendants sought to add several
counterdefendants, including the Societe de Services
de Propriete Industrielle ("SOSPI"), a French

corporation. SOSPI, like SAFT America and SAFT,
S.A. ("SAFT"), is a subsidiary of the French
conglomerate Alcatel Alsthom.

Currently before the court is SOSPI's motion to
dismiss the counterclaims against it for lack of
personal jurisdiction. SOSPI contends that none of
the provisions of Delaware's long arm statute apply to
it, and that it has not had sufficient contacts with the
State to permit the exercise of personal jurisdiction
over it by this court. Counterplaintiffs assert that
jurisdiction may be premised on SOSPI's actions as
an agent of SAFT America and on SOSPI's
independent tortious actions within the State.
Alternatively, counterplaintiffs argue that because the
jurisdictional issue is inextricably entwined with the
merits of the case, the court should reserve the issue
for trial. For the reasons explained below,
counterdefendant's motion will be granted.

II. BACKGROUND

For the purposes of this motion, the court must view
the facts in the light most favorable to the nonmoving
party. The court, therefore, finds the following facts
relevant to this inquiry:

In 1989, representatives of SAFT, Ovonic, and ECD
held discussions in Troy, Michigan for the purpose of
exploring a possible business relationship. (D.I. 51 at
Ex. A) In the course of those discussions, Ovonic
disclosed confidential business and technical
information pursuant to a confidentiality agreement it
had formed with SAFT. Mr. M. Dalsace, Director of
SOSPI, participated actively in these meetings as
SAFT's patent agent. (D.I. 51 at Ex. A) A
representative of SAFT confirmed that SOSPI, as a
sister company and patent agent of SAFT, would be
bound by the confidentiality agreement. (D.I. 51 at
Ex. A)

Counterplaintiffs believe that SAFT, with SOSPI's
help, improperly utilized Ovonic's confidential
information to further its own research and attack
Ovonic's patents. (D.I. 12 at ¶ 24) According to
counterplaintiffs, SOSPI prepared nullity actions
which SAFT filed against Ovonic patents in Germany
and France (D.I. 12 at ¶ 27); served as SAFT's patent
agent on an application before the European Patent
Office using Ovonic's confidential information (D.I.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 190008 (D.Del.)
(Cite as: Not Reported in F.Supp.)

12 at ¶   25); and filed an opposition to counterplaintiff ECD's application for a patent. (D.I. 12 at ¶ 26) According to counterplaintiffs' affidavits, it also "appears that this action to attack the validity of Ovonic's U.S. Patent No. 4,623,597 was prepared and filed with the participation of and/or at the direction of SOSPI, and with the benefit of confidential information that Saft and SOSPI agreed not to use for these purposes." (D.I. 51 at Ex. A) Counterplaintiffs support this allegation by noting SOSPI's participation, on SAFT's behalf, in settlement negotiations relating to the present case which took place in Paris before SOSPI was named as a counterdefendant. (D.I. 51 at Ex. B)

**\*2** Counterplaintiffs do not contend that any of SOSPI's alleged activities took place in Delaware. SOSPI asserts, and counterplaintiffs do not dispute, that SOSPI does not have any offices, employees, real estate or other assets in Delaware, nor has it ever derived revenues from or consumed things or services in the State.

## III. DISCUSSION

SOSPI contends that this court lacks personal jurisdiction over it and accordingly moves for dismissal under Fed. R. Civ. P. 12(b)(2). To defeat a 12(b)(2) motion to dismiss, counterplaintiffs bear the burden of demonstrating through sworn affidavits or other competent evidence that jurisdiction exists. Patterson v. FBI, 893 F.2d 595, 603-04 (3d Cir.), cert. denied, 498 U.S. 82 (1990), citing Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 67 n. 9 (3d Cir. 1984). Once counterplaintiffs have made out a prima facie case, the burden passes to counterdefendant to "present a compelling case that the presence of some other consideration would render jurisdiction unreasonable." Grand Entertainment Group v. Star Media Sales, 988 F.2d 476, 483 (3d Cir. 1993), citing Carteret Sav. Bank F.A. v. Shushan, 954 F.2d 141, 150 (3d Cir.), cert. denied, 113 S. Ct. 61 (1992) (citations omitted). As this court has held, "personal jurisdiction can be asserted over a defendant on the basis of a single act related to the state, if the claim has its basis in the asserted transaction." Blue Ball Properties, Inc. v. McClain, 658 F. Supp. 1310, 1316 (D. Del. 1987).

This court may assert personal jurisdiction to the extent permitted under the Delaware long arm statute, Delaware Code Ann. Title 10, Section 3104 (1978), Max Daetwyler Corp. v. R. Meyer, 762 F.2d 290, 293 (3d Cir.), cert. denied, 474 U.S. 980 (1985), and the

due process clause of the Fourteenth Amendment. Jeffreys v. Exten, 784 F. Supp. 146 (D. Del. 1992). In determining whether jurisdiction lies the court must apply a two step analysis: "First, [the] court must determine whether the alleged conduct of a defendant comes within one of the provisions of the long arm statute .... [T]hen the court must proceed to consider whether the exercise of jurisdiction over a particular defendant violates due process interests." Blue Ball Properties, 658 F. Supp. at 1315.

### A. Delaware Long Arm Statute

Counterplaintiffs allege that personal jurisdiction over counterdefendant is proper under Section 3104(c)(3). This section provides that "a court may exercise personal jurisdiction over any nonresident, or his personal representative, who in person or through an agent ... [c]auses tortious injury in the State by an act or omission in the State." 10 Del. C. § 3104(c)(3). As this court has held, this section is to be construed liberally, favoring the exercise of jurisdiction "to the 'maximum perimeters of the due process clause.'" Mobil Oil Corp. v. Advanced Envtl. Recycling Technologies, 833 F. Supp. 437 (D. Del. 1993), quoting Transportes Aereos de Angola v. Ronair, Inc., 544 F. Supp. 858, 864 (D. Del. 1982).

Jurisdiction under § 3104(c)(3) requires that the tortious act itself, and not merely the resulting harm, occur in Delaware. Applied Biosystems, Inc. v. Cruachem, Ltd., 772 F. Supp. 1458, 1466 (D. Del. 1991). This interpretation is necessary to distinguish § 3104(c)(3) from § 3104(c)(4), which provides for jurisdiction over one who
**\*3** [c]auses tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State ....

This latter section, known as a grant of "general jurisdiction," clearly does not require a nexus between the cause of action and a defendant's activities in the State, but does require a higher level of regular contacts in the State than do the other "specific jurisdiction" subsections. To give this subsection any meaning, the court must read § 3104(c)(3) as requiring a connection between the alleged tortious activity and counterdefendant's presence in Delaware.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3
Not Reported in F.Supp., 1996 WL 190008 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

### 1. Tortious Acts in Delaware

It is undisputed that SOSPI has not had any physical presence in the State of Delaware. Counterplaintiffs contend, however, that SOSPI's participation in the filing of this lawsuit forms a sufficient basis for jurisdiction under this section. As the basis for this conclusion, counterplaintiffs rely on *Mobil Oil Corp. v. Advanced Environmental Recycling Technologies, Inc.,* 833 F. Supp. 437 (D. Del. 1993). In *Mobil Oil,* the court exercised jurisdiction over an individual defendant who had authorized, in his official capacity, the corporate act that was the subject of plaintiff's suit. The individual defendant in that case had been physically present in Delaware only once, but his presence in the State was related to the matter that gave rise to the suit. Jurisdiction was held proper despite the fact that the defendant was not physically present in Delaware when he authorized the corporate act in question. *Id.* at 444-45.

In the case at bar, however, there are two crucial distinctions. First, counterplaintiffs claim only that SOSPI assisted SAFT in filing this case, not that it authorized it. Jurisdiction was proper in *Mobil Oil* only because the defendant in that case had the power to cause the corporate entity to act. *Id.* Counterplaintiffs claim no such authority over SAFT on the part of SOSPI. Second, the defendant found subject to jurisdiction in *Mobil Oil* had some actual contact with the forum state. The court concluded in that case that "[defendant's] authorization of the filing of this ... action on behalf of Mobil and his presence in Delaware as a deposition witness in connection with the lawsuit together create sufficient contacts with Delaware to support personal jurisdiction under subsection (c)(3)." *Id.* at 444 (emphasis added). In this case, the element of actual contact with the State is missing. Therefore, this court cannot assert personal jurisdiction over SOSPI based solely on its alleged assistance in filing this suit.

### 2. Agency Theory

Counterplaintiffs contend that because SOSPI acted as an agent of SAFT America, the latter's activities can be imputed to the former. Thus, SOSPI, through its principal SAFT America, has committed a tortious act in the State of Delaware. It is true, as counterplaintiffs point out, that jurisdiction may be premised on the actions of an agent, and that an agency relationship may exist between two subsidiaries of a single parent corporation. *Applied Biosystems,* 772 F. Supp. at 1463. To impute SAFT America's actions to SOSPI, however, counterplaintiffs must show that SOSPI was the principal, and that it exerted control over SAFT America, its agent. As the court stated in *Applied Biosystems:*

*\*4* The factors relevant to this determination include the extent of overlap of officers and directors, methods of financing, the division of responsibility for day-to-day management, and the process by which each corporation obtains its business.

*Id.* By this standard, counterplaintiffs have failed to allege a sufficient factual basis to establish an agency relationship. In fact, they allege not that SAFT was SOSPI's agent, but that SOSPI was SAFT's agent. As the agent, SOSPI could not have directed the alleged tortious acts, and the acts of the supposed principal cannot be imputed to it. *Id.* at 1467. The court, therefore, cannot take jurisdiction over counterdefendant based on a theory of agency.

### 3. Conspiracy Theory

Counterplaintiffs also maintain that SAFT America's actions may be imputed to SOSPI because both were members of a conspiracy whose goal was to undermine counterplaintiffs' patents. Under Delaware law, the actions of a conspirator may be attributed to a co-conspirator for the purposes of asserting personal jurisdiction. *Hercules Inc. v. Leu Trust & Banking (Bahamas) Ltd.,* 611 A.2d 476, 481-82 (Del. 1992). To assert jurisdiction under this theory, counterplaintiffs must establish:
(1) a conspiracy ... existed; (2) the [counter]defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the [counter]defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

*Id.* at 482. *Accord Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.,* 863 F. Supp. 186, 189 (D. Del. 1993). In the case at bar, only one act in furtherance of the alleged conspiracy occurred in Delaware: the filing of this lawsuit. With respect to SOSPI's participation in the filing of this lawsuit, counterplaintiffs allege only that SAFT America consulted with SOSPI before filing, and that a representative of SOSPI attended a meeting in Paris to discuss settlement. These allegations, standing

Not Reported in F.Supp.                                                    Page 4
Not Reported in F.Supp., 1996 WL 190008 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

alone, do not establish a basis for concluding that SOSPI participated in a conspiracy and, therefore, do not form a sufficient basis for asserting jurisdiction under a theory of conspiracy.

### B. Due Process

Even if jurisdiction over counterdefendant were found to exist under the Delaware Long Arm Statute, the requirements of the Due Process Clause of the Constitution would prevent this court from asserting jurisdiction. The Supreme Court of the United States set forth the relevant due process requirements in *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945):

[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Milliken v. Meyer,* 311 U.S. 457 ....

**\*5** In *Hanson v. Denckla,* 357 U.S. 235, 253 (1958), the Supreme Court noted further:[I]t is essential that in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

In addition, the "defendant's conduct and connection with the forum State [[[must be] such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980).By requiring that individuals have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign," ... the Due Process Clause "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit."

*Burger King Corp.,* 471 U.S. at 472 (citations omitted). In a case such as the present,[w]here a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, th[e] "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum, ... and the litigation results from alleged injuries that "arise out of or relate to those activities ...."

*Id.* at 472-73 (citations omitted). It is undisputed in

this case that counterdefendant has had no contact with the State of Delaware. SOSPI maintains no offices, owns no property, has no employees, and derives no revenue from the State of Delaware. Counterplaintiffs have not alleged any act of infringement committed by SOSPI in Delaware. Counterplaintiffs have not asserted that SOSPI directed the filing of this lawsuit, or that it participated in the decision to do so as a co-conspirator. Rather, counterplaintiffs assert only that SOSPI assisted SAFT America in the preparation of the suit. Such allegations fall short of establishing that SOSPI purposely availed itself of the privileges of conducting activities in Delaware. Under these circumstances, counterdefendant SOSPI could not reasonably have anticipated being haled into court here, and to do so would violate the notion of fair play enshrined in the Due Process Clause of the Constitution.

### IV. CONCLUSION

For the forgoing reasons, counterdefendant SOSPI's motion to dismiss for lack of personal jurisdiction will be granted. An order consistent with this opinion shall issue.

D.Del.,1996.
SAFT America, Inc. v. Ovonic Battery Co., Inc.
Not Reported in F.Supp., 1996 WL 190008 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:95cv00430 (Docket) (Jun. 30, 1995)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT  4**

Westlaw.

Not Reported in A.2d                                                                                                         Page 1
Not Reported in A.2d, 2003 WL 1787959 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
CORNERSTONE TECHNOLOGIES, LLC, Arastra,
LLC, Kor Holdings, LLC, and Peter A. Kanjorski
Plaintiffs,
v.
Bruce E. CONRAD and Thomas Unger, Defendants.
**No. Civ.A. 19712-NC.**

Submitted: March 11, 2003.
Decided: March 31, 2003.

Daniel L. McKenty, Gerald J. Hager, McCullough &
McKenty, P.A., Wilmington, Delaware; Richard A.
Breuer, Malvern, Pennsylvania, for Plaintiffs.
John M. Bader, Thomas S. Neuberger, P.A.,
Wilmington, Delaware, for Defendant, Thomas
Unger.
Bruce E. Conrad, Weatherly, Pennsylvania, pro se.

MEMORANDUM OPINION
STRINE, Vice Chancellor.
**\*1** This opinion resolves motions brought by the two
defendants in this case, Thomas Unger and Bruce E.
Conrad, to dismiss the complaint for lack of personal
jurisdiction.[FN1] The opinion also addresses defendant
Conrad's request that this action be stayed or
dismissed in favor of litigation pending in the state
courts of Pennsylvania. Candidly, the clarity of the
factual record and of the parties' legal arguments is
less than ideal, making summarization of this opinion
difficult, and the body of the opinion more
cumbersome and ambiguous.

> FN1. On January 9, 2003, the plaintiffs filed
> an amended complaint. The defendants'
> motions are technically directed at that
> earlier complaint, as opposed to the more
> recent - and more important - amended
> complaint. The plaintiffs point out that
> "[d]efendants declined the opportunity to
> file new motions to the amended complaint
> and elected to treat the motions and briefs
> already filed as being addressed to the
> amended complaint." Pls.' Answering Br. at

2. In any event, the parties have proceeded
on the understanding that the motions to
dismiss (along with the associated briefs) are
responsive to the amended complaint.

In rough terms, this case involves an unwieldy
dispute between the Kanjorski family and defendants
Unger and Conrad, arising out of their involvement in
two limited liability companies whose operations are
based in Pennsylvania, but which are domiciled in
Delaware. The names of those companies are
Cornerstone Technologies, LLC and Arastra, LLC
(collectively, the "LLCs" or the "Companies"); both
are named plaintiffs. The other plaintiffs are Peter A.
Kanjorski, who claims to own 20% of the units of the
two LLCs, and Kor Holdings, LLC, a Kanjorski
family holding entity, claiming to own 60% of the
LLCs' units.

Defendant Unger joined the Companies as an
employee sometime after their formation and is
alleged by the plaintiffs to claim an ownership share
in them.

Defendant Conrad (who is representing himself *pro
se* ) is alleged to have been one of the original
members and managers of both of the LLCs, and to
have been granted a 20% ownership interest in each.

In this case, the plaintiffs seek various forms of
declaratory, injunctive, and monetary relief against
Unger and Conrad.

As to Unger, the plaintiffs seek a declaration that he
does not own any units of either LLC. The problem
with this request is that the instrument upon which
Unger supposedly bases his claim to units was
executed entirely in Pennsylvania well after the LLCs
were first formed and only references his possible
receipt of units in another entity, not the two
LLCs.[FN2] Thus, the sole theory that the plaintiffs
press regarding the propriety of personal jurisdiction
over Unger is that he is subject to jurisdiction under §
3104(c)(1) of the Delaware long-arm statute. The
transactions of business in Delaware that the
plaintiffs seek to attribute to Unger are the acts of the
original founders of the LLCs in forming those
entities in Delaware - acts that occurred before Unger
was even involved with the LLCs in any manner. The
plaintiffs claim that these prior acts can be attributed
to Unger because he allegedly claims to have become

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                   Page 2
Not Reported in A.2d, 2003 WL 1787959 (Del.Ch.)
(Cite as: Not Reported in A.2d)

a member of the LLCs well after they were formed. As a factual matter, of course, this chain of inference is impossible without attributing supernatural powers to Unger and therefore § 3104(c)(1) is not satisfied. For that and other reasons, Unger's motion to dismiss is granted.

> FN2. As I shall also note later, Unger actually disclaims owning units in either of the Companies, and contends that he owns shares in another entity related to the Companies, which is not a party to this case.

As to Conrad, the questions are a bit more difficult and numerous. The plaintiffs have made a *prima facie* showing that Conrad was a founding member, manager, and high-level officer of each of the LLCs. In two counts of their complaint, the plaintiffs seek a declaration that Conrad was properly removed as a manager of the two LLCs. Under *6 Del. C. § 18-110(a)*, Conrad may be served with process over these claims.

**\*2** Somewhat more problematic are certain other claims against Conrad. Stated summarily, these allege that Conrad violated a provision of the LLCs' operating agreements that require their members, among other things, to offer their units to the other members before trying to sell them to third-parties. The plaintiffs seek various forms of relief tied to that central contention, the primary being declaratory relief clarifying exactly the ownership interests that Conrad (and impliedly others) hold or (the plaintiffs hope) do not hold in the LLCs.

Because there is *prima facie* evidence of Conrad's status as a manager of the LLCs, the plaintiffs argue that jurisdiction over him as to these counts exists under *6 Del. C. § 18-109(a)*, which permits an exercise of personal jurisdiction over a manager (as that term is defined in that subsection) "in all civil actions or proceedings brought in the State of Delaware *involving or relating to the business of the limited liability company* ..."[FN3] These counts seek to resolve disputes regarding the manner in and price at which units of the Companies can be transferred under the Buy-Out Provision. This Provision can be viewed as touching on important aspects of the Companies' governance and basic nature, reflecting as it does a commitment by the founding members - of which Conrad was one - that the original members should have the opportunity to buy the other members' units before they passed into the hands of strangers.

> FN3. Emphasis added.

Moreover, the (albeit confusing) record suggests that Conrad has in the past asserted that the Companies issued - or committed to issue - units to certain employees (including Unger), and that these units are therefore exempt from the reach of the Buy-Out Provision. Given the relation of all these issues to the business of the LLCs, *§ 18-109(a)* is a proper basis for the assertion of personal jurisdiction under the teaching of *Assist Stock Management L.L.C. v. Rosheim.*[FN4] Furthermore, as a founding manager, member, and top ranking officer of the two Delaware LLCs who personally participated in the choice to invoke the laws of this state to govern the internal affairs of those entities and the contractual duties running among their members, Conrad's constitutional right to due process is not offended by requiring him to face suit here on all the claims raised by the plaintiffs in this case.

> FN4. *753 A.2d 974 (Del. Ch.2000).*

For these reasons, I therefore grant Unger's motion to dismiss but deny Conrad's.

In the last portion of the opinion, I address Conrad's motion to stay this litigation in favor of other litigation filed against him by Cornerstone in Pennsylvania. Although this motion has been briefed in a somewhat sketchy way, I am convinced that a stay is in order. At the same time it seeks to have Conrad answer substantial claims in this court, Cornerstone - at the instance of the Kanjorskis - has filed serious breaches of fiduciary duty claims against Conrad in Pennsylvania and has secured a trial date for later this year. No sensible reason suggests itself why Cornerstone has split its claims against Conrad in this way because the fiduciary duty claims could have obviously been filed here, and there appears no obstacle to the claims filed here being asserted in the Pennsylvania action.

**\*3** Furthermore, the Pennsylvania case has the added advantage that Unger is a party there and that others with a possible interest in the suit (*e.g.,* the other possible recipients of unit transfers from Conrad) can be joined to that action. The absence of Unger (and other possible transferees of units from Conrad) from this suit, moreover, has a possible effect none of the parties has addressed. To the extent the plaintiffs seek (in Count I of their complaint) to rescind supposed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1787959 (Del.Ch.)
(Cite as: Not Reported in A.2d)

transfers to Unger and other persons not before the court, the important policy concerns of Court of Chancery Rule 19 will also be implicated.

Although I will not dismiss this action in favor of the Pennsylvania action at this time, it is inefficient and needlessly burdensome for this action to proceed against Conrad simultaneously with a Pennsylvania action that is on a fast track to trial before the end of this year. Although a plaintiff's choice of forum is to be respected, its choice to multiply forums for no apparent purpose need not be indulged at the expense of the defendant's interests and the interests of judicial economy.

## I. *Procedural Framework*

As a preliminary matter, it is useful to set forth the procedural framework that governs this motion. On a Rule 12(b)(2) motion, the court may consider the pleadings, affidavits, and any discovery of record, and may even hold an evidentiary hearing.[FN5] The burden of showing a basis for the court's exercise of personal jurisdiction over a nonresident defendant rests with the plaintiffs.[FN6] In a case like this one, when no evidentiary hearing has been held, the plaintiffs' burden is a relatively light one - *i.e.,* they must only make "a prima facie showing that the exercise of personal jurisdiction is appropriate." [FN7] And, in such a case, "the record is construed in the light most favorable to the plaintiff." [FN8]

> FN5. *See* 1 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 3-3 (2003).

> FN6. *See id.;* 2 James Wm. Moore et al., *Moore's Federal Practice* § 12.31(4) (3d ed.2002).

> FN7. 1 Wolfe & Pittenger, § 3-3; *see Hart Holding Co. v. Drexel Burnham Lambert Inc.,* 593 A.2d 535, 539 (Del. Ch.1991); *Francosteel Corp. v. M/V Charm,* 19 F.3d 624, 626 (11th Cir.1994);* 2 Moore, § 12.31(5).

> FN8. 1 Wolfe & Pittenger, § 3-3; *see Computer People, Inc. v. Best Int'l Group, Inc.,* 1999 WL 288119, at *5 (Del. Ch. Apr. 27, 1999);* 2 Moore, § 12.31(5).

## A. *The Facts*

### 1. *The Formation of the Companies and the Pertinent Features of their Operating Agreements*

Cornerstone and Arastra were both formed by three original members - plaintiff Kor Holdings, plaintiff Peter A. Kanjorski, and defendant Conrad. The plaintiffs have made a *prima facie* showing that each of these three members -including Conrad - signed the operating agreement for each Company. In one of many unusual aspects to this case, Conrad admits signing the Cornerstone operating agreement but claims that the signature that purports to be his on the Arasta agreement was forged. For purposes of this motion, however, I must draw the inference that the signature on the Arasta agreement was put there by Conrad's own hand.

According to each operating agreement, Kor Holdings has a sixty percent membership interest, while Peter A. Kanjorski and Conrad each hold a twenty percent membership interest. Each of the operating agreements has a provision that requires a member to offer his interest in the Company to the other members and, if they decline, to the Company itself before offering to transfer such an interest to any other person (collectively I refer to the two provisions singularly as the "Buy-Out Provision"). Under each of the operating agreements, a member who does not comply with the Buy-Out Provision
*4 shall ... indemnify and hold harmless the Company and the other Members from all cost, liability, and damage that any such indemnified Persons may incur (including incremental tax liability and lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.[FN9]

> FN9. Cornerstone Operating Agreement § 6.5; Arastra Operating Agreement § 6.5.

Each operating agreement provides for a board of managers to manage or direct the management of the business and affairs of the Company. And each operating agreement establishes certain corporate offices, to be appointed by the board of managers. The Chief Executive Officer of each Company is the officer who is, under the operating agreements, responsible for the general management of the Company.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1787959 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Finally, each operating agreement has a provision that authorizes the actions necessary to form each Company as a Delaware limited liability company. [FN10] In other words, the members of the Companies contemplated that certain steps (e.g., a filing with the Delaware Secretary of State) would be necessary to formally form Cornerstone and Arastra as Delaware limited liability companies.

> FN10. Cornerstone Operating Agreement § 1.1; Arastra Operating Agreement § 1.1.

### 2. Conrad's Involvement with the Companies

At various points, Conrad served as President, Chief Executive Officer, and manager of Cornerstone and Arastra. The plaintiffs have produced evidence, in the form of a draft September 18, 2000 letter from Conrad to Richard M. Pell, to support their assertion that Conrad was formerly an officer of Cornerstone and Arastra. In that letter, Conrad claims to have been the President and Chief Executive Officer of Cornerstone, Arastra, and a related company. [FN11] And, according to the operating agreements, "the Chief Executive Officer shall serve as one of the Managers." [FN12]

> FN11. See Am. Compl. Ex. D ("As you know, on August 4, 2000, you signed an Equity Agreement dated August 15, 2000, which I countersigned in my capacity as President and CEO of Arastra, LLC, Cornerstone Technologies LLC, and Pennsylvania Micronics, LLC ...").

> FN12. Cornerstone Operating Agreement § 3.3(b); Arastra Operating Agreement § 3.3(b).

### 3. Unger's Involvement with the Companies

Unger served as an employee of Cornerstone from December 1999 to May 2001. The plaintiffs allege that Unger claims to have come into possession of units in and thus become a member of the Companies. Unger allegedly came into possession of whatever units he owns by way of a September 18, 2000 purported assignment by Conrad to Unger and a May 20, 2001 purported assignment by David Carpenter to Unger.

In keeping with the odd nature of this record, Unger disclaims any ownership of units in either of the Companies. His co-defendant, Conrad, however, claims that Unger was promised a significant block of units to be issued to him once he became an employee.

### 4. The Chain of Events Leading to this Suit

There is little clarity about the precise nature of the disputes between the Kanjorskis and Unger and Conrad; what is relevant and can be discerned now follows.

It appears that at some point in time Conrad felt that certain employees of the Companies had been promised an equity stake of some kind in an August 15, 2000 agreement. I infer this from a September 18, 2000 letter attached to the complaint and a later letter. The September 18, 2000 letter purports to be from Conrad to Richard M. Pell, and states in pertinent part that:

*5 As you know, on August 4, 2000, you signed an Equity Agreement dated August 15, 2000, which I countersigned in my capacity as President and CEO of Arastra ... [and] Cornerstone.... At that time it was understood by me that the majority shareholders of the Companies had fully authorized the execution of that Agreement. I have since been informed otherwise.

If the majority shareholders do not ultimately authorize equity grants to you in an acceptable form, I am committed to making you whole for the commitment I made to each of you, Bob Marshall and Tom Unger, from equity which is totally in my control. If this document is accepted by you, I hereby cause to be assigned to you an undivided interest in my 20% holding in the Companies, such that you will have a call on the value of the 20% of the 20% held by me. While I cannot actually deliver shares to you, I intend to bind the value of this 4% equity interest to you as though it were formally held by you through the ownership of share certificates therefor. [FN13]

> FN13. Am. Compl. Ex. D.

That is, all told Conrad (going only by the draft letter) purports to have attempted to transfer three-fifths of his twenty percent portion, or twelve percent of the Companies. The letter does not reflect any mention of the Buy-Out Provision. Also relevant is the implicit suggestion that Pell, Marshall, and Unger had been promised units in the Companies by Peter Kanjorski and Conrad, acting as Company managers.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1787959 (Del.Ch.)
(Cite as: Not Reported in A.2d)

It is not clear from the record whether Pell, Marshall, or Unger accepted Conrad's offer.

The record then fast-forwards to May 6, 2001. On that day, a number of important events occurred involving the governance of Cornerstone and Arastra. First, Kor Holdings and Peter A. Kanjorski (as purported holders of a total of eighty percent of the original membership units of Cornerstone and Arastra, respectively, in accordance with the literal terms of the operating agreements) executed written consents that (1) removed Conrad as manager of Cornerstone and Arastra; (2) increased the number of managers of each Company to four; and (3) installed Peter A. Kanjorski, Russell P. Kanjorski, Mark A. Kanjorski, and Paul Eric Kanjorski (the "Kanjorskis") as the new managers. Second, the newly constituted boards of managers (1) removed Conrad from his position as President of each Company; (2) removed him from any other position with the Companies; (3) terminated his employment with the Companies; and (4) ended Conrad's ability to act on behalf of the Companies. Third, the boards elected Peter A. Kanjorski to the offices of Chief Executive Officer and President and Paul Eric Kanjorski to the offices of Secretary and Treasurer.

As might be expected, this action triggered the likelihood of lawsuits. In anticipation of legal action, it appears that on May 20, 2001, an individual named David Carpenter executed an assignment that purported to transfer Carpenter's entire interest in Cornerstone and Arastra to Conrad and Unger. [FN14] According to the terms of the purported assignment, Conrad and Unger were each to receive fifty percent of Carpenter's (unspecified) holdings in the Companies. In exchange, Carpenter received one dollar and other "valuable consideration."

FN14. See Am. Compl. Ex. A.

*6 Also, in the May 20 document, Carpenter purported to "assign[ ] any rights he may have in litigation against Peter Kanjorski and others with respect to the [Companies]." [FN15] That assignment of litigation rights was to be equally divided between Conrad and Unger. Notably, the assignment letter purporting to assign Carpenter's ownership interest does not indicate any attempt to comply with the Buy-Out Provision. Nor does the document explain how Carpenter acquired his interests in the Companies and certain unnamed others, except to reference a supposed May 15, 1997 agreement.

FN15. Id.

In other litigation, Conrad has asserted that the May 15, 1997 agreement gave himself, Carpenter, and Unger nearly sixty percent of Cornerstone's equity - and that the Kanjorski family was to own nearly 40%. Conrad implies that the equity allocation expressly set forth in the operating agreements is misleading, because Kor was only supposed to hold Unger's nearly twenty percent equity share until Unger became an employee. As indicated, consistent with the generally confusing nature of the record, Unger expressly disclaims any ownership interest in either of the Companies.

On May 30, 2001, Barry H. Dyller, who was then Conrad's lawyer, sent a letter to the plaintiffs' lawyer offering to sell to "the Kanjorski family or any member you designate" Conrad's twenty percent interest in Cornerstone for $3.9881 million. [FN16] This offer was expressly made as a confidential offer of settlement.

FN16. Am. Compl. Ex. E.

Finally, on August 16, 2002, the members of each Company voted to ratify the earlier May 6 appointment of managers and to elect those persons appointed on May 6 to the board of managers. That is, the Kanjorskis were elected to the board. On all of the motions made at the members' meetings, Peter Kanjorski and Kor Holdings (as represented by Peter Kanjorski) voted "yes." Bruce Conrad was absent and therefore did not vote on each measure.

B. *The Pennsylvania Actions*

There are three Pennsylvania state court actions that relate to the dispute before me. The first is an action filed by defendant Unger on February 12, 2002 in the Court of Common Pleas of Northampton County (the "Employment Action") against Cornerstone. In his complaint, Unger claims that Cornerstone unlawfully terminated him from his position as an executive employee of the Company. Unger argues that this termination violated the provisions of (1) an employment contract between Unger and Cornerstone and (2) the Pennsylvania Human Relations Act, in that Unger's termination was supposedly motivated by Unger's age. In the Employment Action, Unger does not assert any

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 6
Not Reported in A.2d, 2003 WL 1787959 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

ownership interest in either Cornerstone or Arastra. Unger and Cornerstone are the only parties to the Employment Action.

The second of the related actions was filed against Conrad by Cornerstone in the Court of Common Pleas of Carbon County on July 2, 2002. In that action, Cornerstone sought the return of a company computer (or damages equal to its value) allegedly retained by Conrad after his termination by Cornerstone (the "Replevin Action"), as well as compensatory damages, punitive damages, and an award of attorneys' fees.

**\*7** In response to the complaint in the Replevin Action, Conrad raised a number of preliminary objections, including that: (1) the actual owners of Cornerstone had not authorized the Replevin Action because Cornerstone is "59.5% owned by Mr. Conrad, Mr. Unger and Dr. Carpenter"; [FN17] (2) there were two prior-filed actions (namely, the "Employment Action" and this Delaware action); and that (3) Cornerstone had failed to join certain indispensable parties. On January 15, 2003, the Northampton County Court of Common Pleas denied Conrad's preliminary objections in the Replevin Action.[FN18] Cornerstone and Conrad are the only parties to the Replevin Action.

> FN17. Conrad's Prelim. Objections & Mot. for Summ. J. at 3 (capitalization and bold emphasis omitted).

> FN18. *See Cornerstone Techs., LLC. v. Conrad*, No. C0048CV20027475, order at 1 (Pa.Ct.Com.Pl. Jan. 15, 2003).

The third action was filed by Cornerstone against Conrad and Unger on July 2, 2002 in the Court of Common Pleas of Carbon County (the "Equity Action"). In the Equity Action, Cornerstone complained that Conrad and Unger had breached their fiduciary duties, their duties as employees, and their obligations under certain confidentiality agreements, to Cornerstone, by, among other things, improperly disclosing Cornerstone trade secrets and engaging in illicit competition with the Company. Additionally, Cornerstone sought an injunction ordering Conrad and Unger to relinquish control over certain "tangible media" owned by Cornerstone, enjoining them from disclosing Cornerstone trade secrets, and requiring them to account to Cornerstone for any benefit they received as result of any improper disclosure of Cornerstone trade secrets.

And, Cornerstone sought a judicial declaration that certain inventions are its property.

Conrad filed preliminary objections to the Equity Action that were identical to the preliminary objections he filed in the Replevin Action, and reiterated his contention that Conrad, Unger, and Carpenter own 59.5% of Cornerstone's equity. On December 20, 2002, the Northampton County Court of Common Pleas overruled all of Conrad's (and Unger's separate) preliminary objections in the Equity Action.[FN19] In the Equity Action, Cornerstone is the only plaintiff, and Conrad and Unger are the only defendants.

> FN19. *See Cornerstone Techs., LLC v. Conrad*, No. C0048CV2002-7475, slip op. at 5 (Pa.Ct.Com.Pl. Dec. 20, 2002).

On the same day that the judge overruled Conrad's and Unger's preliminary objections in the Equity Action, he entered an order coordinating that Action with the Employment Action and Replevin Action, with the result that all three Pennsylvania Actions will proceed in an essentially consolidated manner. That court, the Northampton County Court of Common Pleas, has set a schedule for the consolidated action that mandates that discovery be completed by July 1, 2003, that all dispositive motions be filed by July 15, 2003, and that trial begin on December 15, 2003.[FN20]

> FN20. *See Cornerstone Techs., LLC v. Conrad*, No. C0048CV2002007475, order at 2 (Pa.Ct.Com.Pl. Jan. 31, 2003).

### C. The Counts of the Complaint

In summary, the plaintiffs complain that Conrad and Unger are making certain false claims of ownership in Cornerstone and Arastra and that, as a result, uncertainty exists about who can make decisions for the Companies, an uncertainty that supposedly hampers the Companies' ability to deal with third parties. While conceding that Conrad enjoys a twenty percent stake in Cornerstone and Arastra, the plaintiffs seek a judicial declaration that Conrad's interest in the Companies is no more (or less) than that twenty percent and that Unger has no interest at all in the Companies.

**\*8** The precise counts of the complaint can be grouped as follows:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 7
Not Reported in A.2d, 2003 WL 1787959 (Del.Ch.)
(Cite as: Not Reported in A.2d)

### 1. *The Ownership Count*

In Count I, the plaintiffs seek a judicial declaration that Conrad owns solely a twenty percent stake in each of the Companies and that Unger enjoys no such ownership stake whatsoever. The Ownership Count is linked in an important way to the Buy-Out Counts, which I next summarize. The reason is that it is the conduct that is alleged in the Buy-Out Counts that gives rise to the plaintiffs' concern about the proportion of the Companies' equity that is owned by Conrad and Unger.

### 2. *The Buy-Out Counts*

In Count II, the plaintiffs complain that Conrad's offer to transfer four percent interests in the Companies to each of Pell, Marshall, and Unger violated the Buy-Out Provision. In other words, Conrad should have made an offer to sell the interests to his fellow members and the Companies before making such offers to Pell, Marshall, and Unger.

It is not clear from the record whether the plaintiffs allege that any of Conrad's offers were accepted. To the extent that Pell, Marshall, and/or Unger accepted Conrad's offer, I read the complaint as requesting an invalidation of the transfer(s). Even if the offers were not accepted, the complaint seems to seek a mandatory injunction requiring Conrad to offer the units he offered to Pell, Marshall, and Unger to the other members and/or the Companies who have rights under the Buy-Out Provision at the price that the Provision would have dictated as of September 18, 2000.[FN21]

---

FN21. Am. Compl. at 5.

In Count III, the plaintiffs argue that Conrad's settlement offer, by way of his attorney's letter, to sell his entire stake in Cornerstone to the Kanjorski family also violated the Buy-Out Provision of that Company's operating agreement. As in Count II, Count III seeks to require Conrad to put his equity to the parties having rights under the Buy-Out Provision in accordance with the terms that Provision would have dictated at the time Conrad made his settlement offer.[FN22]

---

FN22. Am. Compl. at 6.

In Count IV, the plaintiffs request an award of attorneys' fees and other litigation expenses incurred in their attempt to enforce the Buy-Out Provision. The plaintiffs argue that the operating agreements require any party that violates the Buy-Out Provision to indemnify the members and the Companies for all costs associated with enforcing the Buy-Out Provision and the indemnity provisions.

### 3. *The Removal Counts*

In Counts V and VI, the plaintiffs seek judicial confirmation of Conrad's removal as a manager and officer of the Companies. Furthermore, the plaintiffs want me to approve the managers' subsequent appointment of Peter Kanjorski as President and CEO and Paul Eric Kanjorski as Secretary and Treasurer of the Companies.

### II. *Analysis*

To determine whether this court may exercise personal jurisdiction over Unger and Conrad, I must engage in a two-part analysis.[FN23] First, I must ask whether a statute of this state authorizes the exercise of personal jurisdiction over each of them. Second, I must determine whether such an exercise of jurisdiction would comport with the due process requirements of the Fourteenth Amendment to the United States Constitution.[FN24] The Fourteenth Amendment requires that a nonresident defendant have certain "minimum contacts" with the forum jurisdiction "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' "[FN25]

---

FN23. *See* 1 Wolfe & Pittenger, § 3-3.

FN24. *See Hercules Inc. v. Leu Trust & Banking (Bahamas) Ltd.,* 611 A.2d 476, 480-81 (Del.1992), *cert. dismissed,* 507 U.S. 1025 (1993).

FN25. *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463 (1940)); *see also LaNuova D & B, S.p.A. v. Bowe Co.,* 513 A.2d 764, 769-70 (Del.1986) (applying *International Shoe* ).

*9 I begin my analysis with defendant Unger.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1787959 (Del.Ch.)
(Cite as: Not Reported in A.2d)

A. *Statutory Analysis*

1. *Unger*

The plaintiffs rely solely on the provisions of Delaware's long-arm statute [FN26] to support their claim that this court has personal jurisdiction over Unger. The plaintiffs concede [FN27] that the only relevant part of the long-arm statute is 10 *Del. C.* § 3104(c)(1), which provides:

> FN26. 10 *Del. C.* § 3104.

> FN27. *See* Pls.' Answering Br. at 6.

(c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
(1) Transacts any business or performs any character of work or service in the State ...

Section 3104(c)(1) is a "single act" provision of the long-arm statute. [FN28] As such, § 3104(c)(1) supplies a basis for personal jurisdiction "only with respect to claims that have a nexus to such forum-related conduct." [FN29] The plaintiffs have only pointed to two acts committed in the State of Delaware that have any relevance to this litigation - *i.e.,* the acts of forming (1) Cornerstone and (2) Arastra as Delaware limited liability companies.

> FN28. *See* 1 Wolfe & Pittenger, § 3-5(a)(1)(i).

> FN29. *Id.; see LaNuova*, 513 A.2d at 768.

But the plaintiffs have not even alleged that Unger committed or caused to be committed either of these acts in the State of Delaware. Unger's name is noticeably absent from the operating agreements. He did not sign those agreements. He is not listed as a member in either agreement. There is no indication whatsoever that he had any role in the founding and formation of either Cornerstone or Arastra. Undeterred by these facts, the plaintiffs advance a novel legal argument - that because Unger allegedly became a member of the Companies *later,* he should

be treated for jurisdictional purposes as if he had *earlier* authorized these acts.

I refuse to adopt the plaintiffs' invitation to engage in metaphysics. Section 3104(c)(1), by its own terms, requires that the transaction of business in question be performed "in person or through an agent." [FN30] The plaintiffs have not produced any evidence showing that Unger had anything to do with the filing of the limited liability company documents for Cornerstone and Arastra. Therefore, the plaintiffs have not met their burden to show that Unger transacted any business (either personally or through an agent) in Delaware. Section 3104(c)(1) thus does not supply this court with personal jurisdiction over Unger and his motion must be granted.

> FN30. 10 *Del. C.* § 3104(c).

2. *Conrad*

I now turn to the plaintiffs' argument as to why personal jurisdiction exists over Conrad. As with Unger, the plaintiffs initially rely upon § 3104(c)(1). The plaintiffs argue that Conrad, by signing the operating agreements, authorized an individual (*i.e .,* an agent) to take certain actions in Delaware to effect the formation of Cornerstone and Arastra as Delaware LLCs. [FN31] The plaintiffs contend that these acts in Delaware are sufficient to bring Conrad within the scope of § 3104(c)(1). Unlike Unger, however, Conrad cannot so easily disclaim his connection to the acts in Delaware necessary to form the Companies as Delaware LLCs because he was a founding member and top manager of them - *i.e.,* he was an original joint venturer.

> FN31. *See* Cornerstone Operating Agreement § 1.1; Arastra Operating Agreement § 1.1.

**\*10** Two questions emerge regarding the act of forming the LLCs in Delaware. First, is it a transaction of business to form two Delaware LLCs through the Secretary of State's office? Second, if it is, do the claims against Conrad have a sufficient nexus to those acts to satisfy § 3104(c)(1)?

I decline to reach either question, because I believe the plaintiffs have raised other more direct statutory grounds for the assertion of personal jurisdiction over Conrad. The second question is an important one and it is preferable to avoid addressing it without the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1787959 (Del.Ch.)
(Cite as: Not Reported in A.2d)

necessity to do so, especially given the less than ideal state of the briefing.[FN32]

> FN32. The reason the issues are important may be stated thusly. As to the first question, the Delaware Supreme Court's instruction that § 3104(c)(1) be read expansively would seem to counsel in favor of a conclusion that the actual formation of a Delaware entity, by way of a transaction with the Secretary of State, constitutes a transaction of business in Delaware. *See Hercules,* 611 A.2d at 480 ("[Section] 3104(c) is to be broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause."). Certainly, such a reading does no great violence to the statutory text as an actual transaction has been consummated that involves the payment of money in exchange for the right to form a new legal entity.
>
> The more knotty policy question then becomes one of nexus. Should any claim for a later breach of the terms of the governing instrument of an entity be deemed to have the required nexus to the original transaction in Delaware that gave final life to that instrument as a legally viable contract? If answered affirmatively, § 3104(c)(1) would operate - subject to constitutional limitations - to ensure service of process against any founder of a Delaware entity to whom the act of formation in Delaware can be attributed in any case involving the proper interpretation or possible breach of that entity's governing instrument. This broad sweep may possibly fulfill the our Supreme Court's command that the long-arm statute be construed liberally, but there is no reason to use this case to test that theoretical possibility.

I find it unnecessary to explore the outer regions of § 3104(c)(1)'s reach because two separate provisions of Delaware's LLC statute provide a sufficient basis to exercise personal jurisdiction over Conrad and no constitutional problem arises with their use.

First, § 18-110(a) sustains jurisdiction over Conrad as to those parts of the Removal Counts relating to his alleged removal and replacement as a manager of the Companies. Second, § 18-109 provides a basis for jurisdiction against Conrad on the other counts of the complaint. I begin with the manager Removal

Counts.

### a. *6 Del. C. § 18-110 and the Manager Removal Counts*

The Delaware Limited Liability Company Act, *6 Del. C.* § 18-110(a), allows this court, upon the application of a member or manager of a limited liability company, to determine the validity of any admission, election, appointment, removal or resignation of a manager ... and the right of any person to become or continue to be a manager ... and, in case the right to serve as a manager is claimed by more than 1 person, [to] determine the person or persons entitled to serve as managers.... [FN33]

> FN33. *6 Del. C.* § 18-110(a).

Section 18-110(a) also provides for constructive service of process:

In any such application, the limited liability company shall be named as a party and service of copies of the application upon the registered agent of the limited liability company shall be deemed to be service upon the limited liability company and upon *the person or persons whose right to serve as a manager is contested and upon the person or persons, if any, claiming to be a manager or claiming the right to be a manager ....* [FN34]

> FN34. Emphasis added.

Put simply, § 18-110(a) provides a clear basis for jurisdiction over Conrad as to those parts of the Removal Counts relating to his alleged removal and replacement as a manager of the Companies. In attempting to resist jurisdiction pursuant to § 18-110, Conrad makes an unusual argument. Namely he argues that he "cannot dispute [his removal as manager because] that has never occurred." Why was he never removed? Because Conrad claims that he "has never served as a manager of the companies nor has there ever been a board of managers [of the companies]." [FN35] As such, Conrad in essence argues that he does not fall within the ambit of § 18-110(a) because he is not claiming to be a manager and his right to be a manager cannot be properly contested because the Companies have never had managers. And, indeed, with respect to Arastra, Conrad argues

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1787959 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

that its operating agreement is a forgery and therefore inoperative.[FN36]

> FN35. Conrad's Answering Br. at 8.

> FN36. *See id.* at 8 & 10. I have inspected the copy of Arastra Operating Agreement submitted as an exhibit to the amended complaint and it appears that Conrad's signature is authentic. At this point in the proceedings, I therefore must conclude that the plaintiffs have met their *prima facie* burden of showing that Arastra has a valid operating agreement that Conrad signed.

**\*11** If anything, Conrad's answering brief makes me more likely to believe there is a dispute regarding the governance and management of the Delaware LLCs at issue in this case. Conrad calls into question, among other matters, (1) his purported removal as manager and an officer of the Companies; (2) whether Arastra's operating agreement is valid; and (3) whether the Companies have boards of managers.

Moreover, Conrad's rather odd arguments do not suffice to defeat this court's jurisdiction over him. The plaintiffs have produced sufficient evidence to meet their *prima facie* burden to show that Conrad at one time claimed to be a manager - and CEO - of Cornerstone and Arastra. By the literal terms of the operating agreements, the CEO of the Companies was also to be a manager. [FN37] Thus, it is not irrational for the plaintiffs to wish to have a judicial declaration of the validity of Conrad's removal as manager.

> FN37. This fact, coupled with Conrad's status as a founder, large unitholder, and top officer, as well as the reality that the Kanjorskis went to the trouble to vote Conrad off as a manager of both Companies, provides a sufficient factual foundation for me to assume that Conrad was a manager at all relevant times before his purported removal in May 2001.

By the plain terms of § 18-110(a), "the Court of Chancery may hear and determine the validity of any admission, election, appointment, *removal* or resignation of a manager of a limited liability company." [FN38] And, the plaintiffs may constructively serve Conrad under § 18-110(a) because he is a "person ... whose right to serve as a manager is

contested." If, upon reflection, Conrad adheres to his view that he was never a manager of either Company, he is free to enter into a stipulated judgment to that effect. But his disclaimer of that status does not operate to divest this court of personal jurisdiction over him under § 18-110(a).

> FN38. Emphasis added.

Furthermore, I conclude that because of Conrad's status as a manager, he can also be fairly asked to contest any question of his removal as President (and other offices, such as CEO) in this same action. As with § 3114 of the Delaware General Corporation Law, § 18-110(a) ought to be read sensibly to sweep in sufficiently related claims against an LLC manager so long as there would be no constitutional offense. Conrad was purportedly removed as President of the Companies (and from all other offices at the Companies) on the same day as he was allegedly removed as a manager. There is thus a close nexus between these claims. And if there were any question on that score, it is obvious that another provision of our LLC statute subjects Conrad to this court's jurisdiction over his purported removal as CEO and President: § 18-109 of the LLC statute.

### b. *§ 18-109 and the Removal, Ownership and Buy-Out Counts*

Section 18-109 provides a basis for this court's exercise of personal jurisdiction over Conrad with respect to all of the counts of the complaint. Section 18-109(a) permits an exercise of personal jurisdiction over a manager (as that term is defined in that subsection) "in all civil actions or proceedings brought in the State of Delaware *involving or relating to the business of the limited liability company or a violation by the manager ... of a duty to the limited liability company, or any member of the limited liability company.*" [FN39]

> FN39. Emphasis added.

**\*12** Clearly, the question of whether Conrad was properly removed as a manager, CEO, and President of the Companies relates to the business of the Companies. Therefore, § 18-109(a) covers the Removal Counts.

The broad scope of § 18-109(a) also allows this court to exercise personal jurisdiction over Conrad

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1787959 (Del.Ch.)
(Cite as: Not Reported in A.2d)

with respect to the Ownership and Buy-Out Counts of the complaint. In this case, the issue as to who owns what part of Cornerstone and Arastra (*i.e.,* the issue in the Ownership Count) is "related in some respect" to the management disputes underlying this case - *i.e.,* it relates to the business of the Companies.[FN40]

FN40. *See Assist Stock Mgmt. L.L.C. v. Rosheim,* 753 A.2d 974, 981 (Del. Ch.2000).

What is alleged is that a small group of joint venturers formed two Delaware LLCs under a contract with strict controls on who could join the ranks of members. To control that membership right, they put in place a strict Buy-Out Provision that required that members wishing to sell first offer their units back to the other founders, and if they decline, to the Companies themselves.

The equity ownership of the Companies is allegedly clouded because of Conrad's purported failure to abide by that important term in the Companies' operating agreements. As critical, the debate about who owns what has its origins in a dispute about whether Conrad and Peter Kanjorski - as managers and joint venturers - agreed to issue equity in the Companies to Unger and the mysterious David Carpenter in 1997 as well as to certain employees in the year 2000.

In view of the importance of these issues to the capital structure and control of closely-held Delaware LLCs, they obviously relate to the business of those Companies and fall within the literal terms of § 18-109. Put simply, the confusion about ownership arises out of disputed managerial acts. Did the companies promise to issue units to Carpenter and Unger in 1997 and to Unger and certain other employees in 2000? That is, the question of who owns what units depends in a material way on actions Conrad and others took as managers of the Companies. Likewise, these issues also bear a relationship to the validity of the votes removing Conrad as a manager because they relate to the question of whether the plaintiffs had sufficient voting power to cast Conrad out. That is, all of these issues relate to the business of the Companies and therefore satisfy the literal terms of § 18-109(a).

In so concluding, I reach a conclusion consistent with this court's well-reasoned decision in *Assist Stock Management L.L.C. v. Rosheim.*[FN41] In that decision, Vice Chancellor Lamb respected the General

Assembly's decision to write § 18-109 more broadly than § 3114 of the DGCL, by investing this court with personal jurisdiction over managers in disputes "involving or relating to the business of" their LLCs.[FN42] He held that this language must be given effect and that protection against an unconstitutional application of the statute can be afforded by the minimum contacts analysis. [FN43]

FN41. 753 A.2d 974 (Del. Ch.2000).

FN42. In *Assist,* Vice Chancellor Lamb held that a dispute about the ownership interests a manager had in an LLC could be adjudicated when "the ownership question is related in some respect to the [management] matter" in dispute. *Id.* at 981.

FN43. *See Assist,* 753 A.2d at 980.

**\*13** Here, I conclude that all of the Counts bear a clear relation to the business of the LLC and that § 18-109 is satisfied, subject to a minimum contacts analysis.[FN44]

FN44. I bear some concern about the Buy-Out Count dealing with Conrad's offer to sell his stake in Cornerstone to the Kanjorski family (Count III). As Conrad has noted, it is clear that Conrad's offer was part of a confidential settlement proposal, and, as such may be inadmissible under Delaware Uniform Rule of Evidence 408. Indeed, Conrad's attorney's letter is clearly marked "FOR SETTLEMENT PURPOSES ONLY." In other words, by making his settlement offer, Conrad was attempting to terminate a dispute by offering to sell his interests to the Kanjorskis - the functional equivalent of offering his units to Kor and Peter Kanjorski. Whether such an offer to settle can be conceived of as a breach of the Buy-Out Provision is obviously a matter of some doubt.
Notwithstanding any doubts about the ultimate sustainability of Count III, Conrad can be subjected to this court's personal jurisdiction as to that count. Although Conrad's offer to settle was made after his purported removal as manager of the Companies, Count III is sufficiently related to the other counts in the complaint such that an exercise of personal jurisdiction over

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 12
Not Reported in A.2d, 2003 WL 1787959 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Conrad with respect to Count III is proper. *Assist,* 753 A.2d at 981 (when a defendant is subject to personal jurisdiction under § 18-109 as to certain claims, the court may exercise personal jurisdiction over him as to other sufficiently related claims, and citing a § 3114 decision, *Manchester v. Narragansett Capital, Inc.,* 1989 WL 125190 (Del. Ch. Oct. 18, 1989), in support of that proposition); *see also Infinity Investors Ltd. v. Takefman,* 2000 WL 130622, at *6 (Del. Ch. Jan. 28, 2000) ("[O]nce jurisdiction is properly obtained over a non-resident director pursuant to § 3114, such non-resident director is properly before the Court for any claims that are *sufficiently related to the cause of action* asserted against such directors in their capacity as directors."), *clarified by,* 2000 WL 268302 (Del. Ch. Feb. 17, 2000); *Jaffe v. Regensberg,* 1980 WL 3039, at *2 (Del. Ch. Jan. 10, 1980) ("[u]nder § 3114, the relief sought is not the guiding factor because if jurisdiction attaches at all under the statute, the nonresident is before the Court for any and all relief that might be necessary to do justice between the parties by virtue of the fact that the jurisdiction conveyed by the statute is in personam jurisdiction."); 1 Wolfe & Pittenger, § 3-5(a)(2)(iv) (discussing Delaware cases holding that "once a nonresident director is properly before a Delaware court by reason of Section 3114, that director is properly before the court for any relief that the facts may require, even if such relief technically operates against the director in some other capacity, such as that of a stockholder.").

## B. *Constitutional Analysis*

Because 6 *Del. C.* § § 18-109 and 18-110 provide statutory bases for an exercise of personal jurisdiction with respect to Conrad, I briefly address the constitutional inquiry. As I noted earlier, the due process clause of the Fourteenth Amendment requires that a nonresident defendant have certain "minimum contacts" with the forum jurisdiction "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." [FN45] When determining whether these "minimum contacts" are present, the court should inquire whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."

[FN46] Once the defendant's minimum contacts with the forum have been established, the court should turn its analysis to issues of fairness and justice .[FN47]

> FN45. *Int'l Shoe Co.,* 326 U.S. at 316 (citation and internal quotation marks omitted).
>
> FN46. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980).
>
> FN47. *See Burger King Corp. v. Rudzewicz,* 471 U.S. at 462, 476-77 (1985).

With respect to the "minimum contacts" analysis, it is clear that Conrad purposefully availed [FN48] himself of the benefits and protections of Delaware law and that he cannot be surprised to face this lawsuit here. Conrad and his co-venturers could have formed Cornerstone and Arastra as Pennsylvania entities. Instead, they purposely looked to a neighboring state as a place to domicile their Companies and to provide the governing law for their relations. Not only that, Conrad took on the position of manager, CEO, and President of these Delaware Companies, knowing that as a manager he would be subject to jurisdiction for disputes here relating to the business of the Companies.

> FN48. *See id.* at 475.

As such, Conrad should not be surprised that he has been haled into a Delaware court when disputes have arisen over the governance of those Delaware LLCs relating to such fundamental issues as whether he is still a manager or officer, whether he violated the Buy-Out Provision and what that Provision means, and whether he, as manager, issued equity to certain individuals. [FN49]

> FN49. *See id.* at 474; *World-Wide Volkswagen Corp.,* 444 U.S. at 297.

Nor is there anything unfair or unjust about the exercise of personal jurisdiction over Conrad by this court. As a resident of a neighboring state who purposely participated in the founding of the LLCs in Delaware, Conrad will face only minimal inconvenience by having to respond to the claims made against him in this Delaware court action regarding those entities. Moreover, this state has a strong interest in resolving disputes regarding the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                            Page 13
Not Reported in A.2d, 2003 WL 1787959 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

internal affairs of LLCs formed under its laws.[FN50]

> FN50. *Cf. Assist,* 753 A.2d at 981 ("Delaware has a strong interest in providing a forum for disputes relating to the ability of managers of an LLC formed under its law to properly discharge their respective managerial functions.").

Because personal jurisdiction over Conrad is authorized by Delaware statutory law and is not constitutionally infirm, his motion to dismiss for lack of personal jurisdiction will be denied.

### III. *Service of Process*

I recognize, as pointed out by Conrad,[FN51] that service of process on him was not properly effected pursuant to 6 *Del. C.* § 18-109. Instead, the plaintiffs served the defendants under 10 *Del. C.* §§ 3104 and, inexplicably, 3114. Conrad never raised this issue by way of a formal motion. Given this fact, along with the fact that Conrad received *actual notice* of this suit, equity and common sense counsel in favor of giving the plaintiffs leave to properly serve defendant Conrad pursuant to 6 *Del. C.* § 18-109.[FN52] Thus, the plaintiffs shall have leave until April 15, 2003 to effect proper service.

> FN51. *See* Letter from Bruce Conrad to Vice Chancellor Leo E. Strine, Jr. 2 (Mar. 7, 2003).

> FN52. *See Assist,* 753 A.2d at 982 (permitting plaintiff to cure a technical defect in service of process when it appeared that proper service, if made, would be effective to invoke the court's personal jurisdiction over the defendant).

### IV. *Conrad's Motion to Dismiss or Stay this Action in Favor of the Pending Pennsylvania Consolidated Case*

**\*14** In various of his letters to the court, *pro se* defendant Conrad pointed to the inconvenience of facing litigation from Cornerstone in both this state and Pennsylvania. To surface the issue, the court asked the parties to file submissions relating to whether I should stay or dismiss this action pursuant to *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Engineering Co.*[FN53] or on other grounds.

> FN53. 263 A.2d 281 (Del.1970).

Without burdening the reader with a fulsome explanation of the difficulty of applying *McWane* here,[FN54] I proceed to articulate why I believe that I should use my inherent discretion to control my docket and enter a stay. [FN55]

> FN54. One of the reasons it is awkward to shoe-horn this case under *McWane* is that none of the other actions were filed in the first instance by Conrad. Indeed, the two relevant Pennsylvania Actions were filed by Cornerstone and basically involve the Kanjorskis litigating (through Cornerstone) as plaintiffs against Conrad as a defendant.

> FN55. *See Joseph v. Shell Oil Co.,* 498 A.2d 1117, 1123 (Del. Ch.1985).

In the Equity Action, Cornerstone - a key plaintiff here who is putatively controlled by the Kanjorskis through Kor - seeks to litigate breach of fiduciary duty claims against Conrad. That action also involves defendant Unger, whom I have concluded is not subject to this court's personal jurisdiction. The Equity Action, and the other related Pennsylvania actions, are all set to go to trial as consolidated cases later this year.

It remains mysterious to me why the plaintiffs have chosen to spread their claims against Conrad over the court systems of two states. By all measures, it is (modestly) more geographically convenient to litigate this case in Pennsylvania for everyone concerned. Given Cornerstone's own choice to litigate certain Delaware claims - *i.e.,* the fiduciary duty claims - in Pennsylvania, its desire to have a Delaware court adjudicate its other Delaware law claims is inexplicable. Furthermore, it is apparent that the Pennsylvania courts can exercise jurisdiction over Unger and the other parties to whom the plaintiffs believe Conrad either sold or offered to sell the Companies' units.

Given these realities, it is not at all apparent why commercially sensible litigants would engage in litigation tactics of the kind the plaintiffs here have. Whatever the motivation, proper or improper, this court need not indulge the plaintiffs' whim for simultaneous conflict in two different forums of its own choosing against one *pro se* defendant.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Instead, I will stay this action indefinitely, with a view towards permitting Cornerstone to complete its lawsuits against Conrad and Unger in Pennsylvania in accordance with the schedule already established in that case. This will conserve the parties' resources, as well as those of this court. If the plaintiffs are concerned about this method of proceeding, they might usefully consider whether they are actually permitted to split their claims in the fashion they have [FN56] and whether it might not be more sensible for them to raise all of their claims against Conrad, Unger, and related parties in one forum that is convenient. In this regard, it is noteworthy that the plaintiffs have failed to provide any reason to believe that the claims they plead here could not be asserted in the consolidated action pending in Pennsylvania. Put simply, any inconvenience to the plaintiffs of the method of proceeding I have imposed is self-inflicted and is outweighed by the burden to Conrad of fighting two battles on two separate fronts at once for no substantial reason.

> FN56. Both this state and Pennsylvania frown on claim splitting. When a party can raise all claims it has against a defendant in one forum at one time, it is generally obligated to do so. *See, e.g., Maldonado v. Flynn,* 417 A.2d 378, 382 (Del. Ch.1980) ("The rule against claim splitting is an aspect of the doctrine of res judicata and is based on the belief that it is fairer to require a plaintiff to present in one action all of his theories of recovery relating to a transaction, and all of the evidence relating to those theories, than to permit him to prosecute overlapping or repetitive actions in different courts or at different times."); *Coleman v. Coleman,* 522 A.2d 1115, 1120 (Pa.Super.Ct.1987) ("The courts of this Commonwealth have long adhered to the generally accepted view disfavoring the splitting of claims.").

**\*15** Therefore, I grant Conrad's motion for an indefinite stay.

### V. *Conclusion*

For the reasons expressed, (1) Unger's motion to dismiss for lack of personal jurisdiction is granted; (2) Conrad's motion to dismiss for lack of personal jurisdiction is denied; and (3) Conrad's motion for a stay is granted. The stay shall remain in effect indefinitely, but the plaintiffs may perfect service of process on Conrad and may move to lift the stay no earlier than March 1, 2004 or the date of the final termination of the Pennsylvania Equity Action. [FN57]
IT IS SO ORDERED.

> FN57. Of course, whatever actions the plaintiffs will need to take to effect proper service of process over Conrad by April 15, 2003 are exempt from the stay.

Del.Ch.,2003.
Cornerstone Technologies, LLC v. Conrad
Not Reported in A.2d, 2003 WL 1787959 (Del.Ch.)

Briefs and Other Related Documents (Back to top)

• 2002 WL 32992080 (Trial Pleading) Complaint (Jun. 21, 2002) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.